FILED

2026 APR -8 PM 2:41

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| In re: | ) |
| | ) |
| **VICTORY CLEANING SYSTEMS, INC.,** | ) Case No. 24-40010 |
| | ) |
| Debtor. | ) Chapter 11 (Voluntary), Subchapter V |
| | ) |

### DEBTOR'S SUPPLEMENTAL OBJECTION TO
### MOTION TO WITHDRAW AS COUNSEL:
### QUALITY OF REPRESENTATION
### AND REASONABLENESS OF FEES

COMES NOW the Debtor, Victory Cleaning Systems, Inc. ("VCS" or "Debtor"), by Daniel Brown, its principal, appearing pro se for limited purpose, and respectfully submits this Supplemental Objection to Counsel's Motion to Withdraw (Docs. 78, 80) to bring the following facts to the Court's attention regarding the quality of representation and reasonableness of fees paid. This supplemental filing is made in light of developments since the Debtor's initial Response (Doc. 82), including Counsel's corrected Ballot Summary (Doc. 93), Motion to Amend Confirmation Order (Doc. 94), and this Court's Order setting the matter for hearing on April 15, 2026 (Doc. 96).

### I. FEES RECEIVED AND COURT-APPROVED COMPENSATION

1.  WM Law received total compensation of $19,738.00 from the Debtor's estate. (Exhibit G, bank records.)

2.  The only fee order entered in this case approved $14,442.90 in compensation. (Doc. 57, entered July 29, 2024.) No supplemental fee application was filed for any work performed after June 30, 2024.

3.  WM Law collected $5,295.10 in excess of court-approved compensation without seeking approval under 11 U.S.C. Section 330. After the Debtor identified that 13 of 16 ACH payments had not been logged by the firm's accounts receivable manager (Exhibit H), Counsel refunded $1,651.70 on December 19, 2025. The net excess currently retained is $3,643.40. Counsel's own billing ledger (Bill #4, Exhibit B) recorded only 3 of 16 ACH payments received · the firm was collecting estate funds it was not tracking internally and not reporting on the Debtor's account summary or payment history. As a result, Counsel's billing statement showed a balance due of

$6,557.90 without reflecting $6,500 in ACH payments already received · presenting the Debtor with an account status that implied nonpayment. The actual balance at the time of Bill #4 was $57.90. The statement's presentation of $6,557.90 as the amount due · reflecting only $1,500 of the $8,000 in ACH payments the firm had collected · overstated the Debtor's obligation by a factor of 113 and misrepresented the Debtor's payment history as delinquent when the estate had in fact paid consistently every month.

4. On December 8, 2025, Counsel stated in writing: "We are not looking to make money or continue billing for the work done after confirmation." (Exhibit GG.) If true, Counsel's fee entitlement is capped at $14,442.90. If untrue, the statement was a misrepresentation to the client.

5. Beyond the excess fees, the Debtor's review of Counsel's fee application (Doc. 55, Exhibit A) and billing ledger (Bill #4, Exhibit B) reveals that at least 14.9 hours were spent producing work product that was subsequently acknowledged as erroneous, contained false information, attributed fault to the client, or had to be withdrawn:

**Ballot Summary (Doc. 39, acknowledged "filed in error"):**

| Date | Who | Description | Hours | Amount |
|------|-----|-------------|-------|--------|
| 4/11/24 | DS | Drafted Ballot Summary template | 0.8 | $140.00 |
| 4/24/24 | AB | Drafted and mailed ballots with updated deadline | 1.0 | $175.00 |
| 5/22/24 | RAB | Prepared ballot summary for filing | 0.4 | $140.00 |
| | | Subtotal | 2.2 | $455.00 |

The above figures are taken from Doc. 55, Exhibit A, as filed with this Court. The billing statement sent to the Debtor (Bill #4, Exhibit B) reports different hours, rates, and amounts for the same entries. For the DS ballot work on 4/11/24, Bill #4 lists 1.8 hours at $125/hr but charges only $100 (1.8 x $125 = $225, not $100 · the bill's own arithmetic does not compute), while the fee application reports the same work as 0.8 hours at $175/hr for $140. The fee application, the billing statement, and the engagement letter each reflect a different paralegal rate ($175, $125, and $150 respectively) for the same work.

**Plan with $93,092 in unsupported obligations (Doc. 29):**

| Date | Who | Description | Hours | Amount |
|------|-----|-------------|-------|--------|
| 4/1/24 | RAB | Plan drafting | 1.5 | $525.00 |
| 4/2/24 | RAB | Continue drafting plan, liquidation analysis | 3.0 | $1,050.00 |
| 4/2/24 | RAB | Cashflow discussions for plan | 0.5 | $175.00 |
| 4/3/24 | RAB | Continued work on plan | 4.0 | $1,400.00 |
| 4/4/24 | DS | Formatting, compiled exhibits, filed and served | 1.2 | $210.00 |
| | | Subtotal | 10.2 | $3,360.00 |

**Ally stipulation attributing omission to Debtor (Doc. 46):**

| Date | Who | Description | Hours | Amount |
|---|---|---|---|---|
| 6/4/24 | RAB | Drafted proposed resolution to MFRS | 0.8 | $280.00 |

### Confirmation order based on false ballot data (Doc. 49):

| Date | Who | Description | Hours | Amount |
|---|---|---|---|---|
| 6/11/24 | RAB | Drafted confirmation order, circulated for review | 1.2 | $420.00 |

### Motion for Final Decree with wrong debtor name (Doc. 60, withdrawn same day):

| Date | Who | Description | Hours | Amount |
|---|---|---|---|---|
| 9/11/24 | RAB | Filed motion naming "Damon K. Jones" as debtor | 0.5 | $175.00 |

### Summary:

| Category | Hours | Amount |
|---|---|---|
| Ballot Summary (Doc. 39) | 2.2 | $455.00 |
| Plan (Doc. 29) | 10.2 | $3,360.00 |
| Ally Stipulation (Doc. 46) | 0.8 | $280.00 |
| Confirmation Order (Doc. 49) | 1.2 | $420.00 |
| Final Decree (Doc. 60) | 0.5 | $175.00 |
| Total | 14.9 | $4,690.00 |

6. When combined with the other identifiable overcharges, the total reaches $15,888.40:

| Category | Amount |
|---|---|
| False, deficient, or harmful filings (paragraph 5) | $4,690.00 |
| Rate overcharge ($50/hr above standard rate charged to all other clients whose fee applications are available on PACER, 44.4 hrs on fee app) | $2,220.00 |
| Paralegal overcharges (secretarial tasks billed at $125-$175) | $335.00 |
| 11-month zero-work period ACH collections (Oct 2024-Aug 2025, 10 payments) | $5,000.00 |
| Excess over court-approved compensation (Doc. 57), net of $1,651.70 refund | $3,643.40 |
| Total identifiable overcharges | $15,888.40 |

Of the $19,738.00 paid, $15,888.40 is attributable to fees that were excessive, unauthorized, charged for defective work, or collected for no work at all. The Debtor brings this to the Court's attention not to seek disgorgement in this filing, but because it bears directly on the reasonableness of permitting Counsel to withdraw without accounting.

---

## II. QUALITY OF SERVICES RENDERED

7.   The Debtor respectfully submits that the following facts are relevant to this Court's consideration of Counsel's withdrawal and to any review of fee reasonableness the Court or the United States Trustee may undertake.

### A. Petition and Plan Preparation

8.   Counsel filed the petition without completed schedules, resulting in a deficiency notice from the Court. (Doc. 4, Doc. 5.)

8A.   Counsel billed the estate 0.5 hours ($175) to "draft" a Motion for Final Decree (Bill #4, 9/11/24). The filed motion (Doc. 60) named "Damon K. Jones" as the debtor rather than Victory Cleaning Systems, Inc. · a template recycled from another client's case (22-41154, W.D. Mo.) without changing the debtor name. The motion was withdrawn the same day as Doc. 61. Fourteen months later, Counsel filed a Motion to Reopen the case (Doc. 63), which the Clerk struck within two days because the case had never been closed (Doc. 65: "Case is NOT closed"). Counsel billed an additional 0.5 hours ($175) for that motion (Bill #4, 11/3/25). The estate paid $350 for two filings that each failed because Counsel did not verify basic case status before filing. In that same source case (22-41154, W.D. Mo.), Counsel filed a fee application for $29,544 that this Court set for hearing; Counsel then withdrew it and filed an amended application for $6,605 · a 78% self-reduction · acknowledging that the original "erroneously copied numbers from a different fee application." (Doc. 67, Case No. 22-41154; Exhibit R.)

9.   The confirmed plan (Doc. 29) contains $93,092 in unsupported or misclassified secured obligations:

   a.   $72,842 in Class 2 payments attributed to CIT for three vehicles. CIT filed proofs of claim on equipment (grinder and El Diablo) but filed no proofs of claim on the vehicles themselves (Loan 006/007). CIT's own representative confirmed the vehicles are not subject to CIT liens. (Sara Bass, February 27, 2025: "CIT is not a lien holder." Doc. 85, p. 4: Counsel admits no POCs on Loan 006/007.) The plan treats these vehicles as secured CIT debt when the creditor has disclaimed the liens.

   b.   $20,250 to Channel Partners, which filed no proof of claim in this case and had $0 allowed in the Debtor's prior Chapter 13 proceeding.

9A.   The Debtor raised the CIT vehicle issue before the petition was filed. On December 20, 2023, the Debtor emailed Counsel: "I have a bit of a worry about CIT and the vehicles." (Exhibit Z1.) Counsel did not address the issue. The petition was filed 16 days later with no CIT lien analysis. Mr. Wagoner's subsequent claim on January 28, 2026 that the Debtor did not raise this issue "until a few months ago" is contradicted by the pre-filing email chain.

10. The plan's internal arithmetic is contradictory. Exhibit E (Doc. 29, p. 48) projects the CIT secured payment at $471.58 per month. The Class 2 treatment table (Doc. 29, p. 7) states $1,509.16 per month, which is 3.2 times the correct amount. Both figures appear in the same plan. The Exhibit E annual total of $22,204 can only be derived using $471.58.

11. The plan's Class 2 table overstates the monthly CIT payment by $1,037.58 ($1,509.16 stated vs. $471.58 per Exhibit E), resulting in $62,254.80 in excess payments over the 60-month plan term. Combined with the $93,092 in unsupported or misclassified obligations identified in paragraph 9, these errors materially distort the Debtor's plan obligations.

**B. Ballot Reporting**

12. On May 22, 2024, WM Law filed a Ballot Summary (Doc. 39) reporting all creditor classes as "No Vote."

13. The Debtor's client file, produced by Counsel on March 17, 2026, contains five signed ballot acceptances from impaired creditors: American Express National Bank (two ballots, signed May 3, 2024), First Citizens Bank (Class 2 and Class 3, signed May 22, 2024), and Direct Capital Corporation (signed May 22, 2024).

14. Had these acceptances been accurately reported, the plan would have qualified for confirmation under 11 U.S.C. Section 1191(a) (consensual confirmation with immediate discharge) rather than the Section 1191(b) cramdown path the Court was required to employ.

14A. The Confirmation Order (Doc. 49) expressly found compliance with 11 U.S.C. Section 1129(a)(1) through (a)(3), including that the plan was "proposed in good faith." These findings were made in reliance on the Ballot Summary (Doc. 39), which reported no creditor votes. The Court was not informed that five impaired creditors had accepted the plan. Had the Court been informed of the five acceptances, the cramdown analysis under Section 1191(b) would have been unnecessary, and the Court's good faith finding would have supported immediate consensual confirmation under Section 1191(a) with entry of discharge at confirmation.

14B. The Confirmation Order also records that Counsel made an oral motion at the confirmation hearing to extend the deadline for Ally Financial to accept the plan through June 3, 2024. However, Ally had been omitted from the plan entirely (Doc. 29), and no ballot was ever prepared or sent to Ally. Counsel acknowledged at the hearing that Ally needed to accept the plan, then took no action to provide Ally with a ballot or include Ally in the plan. Ally had already filed a Motion for Relief from Stay (Doc. 41) before confirmation. The motion was resolved by stipulation (Doc. 46) and formally withdrawn (Doc. 54) five days after confirmation, on June 19, 2024 · but no order lifting the stay was ever entered.

15. Word document metadata shows the ballot summary was created at 2:42 PM and filed at 3:02 PM on May 22, 2024, a 20-minute turnaround for a document that required reviewing ballot returns.

16. On March 19, 2026, the Debtor sent Counsel a written directive to file a motion correcting Doc. 39 and amending the confirmation from Section 1191(b) to Section 1191(a) with entry of discharge. The directive was served on Mr. Blay, Mr. Wagoner, and the Subchapter V Trustee. The directive set a deadline of March 26, 2026.

17. On March 24, 2026, Counsel circulated a revised Motion to Modify Confirmation Order. In this draft, Counsel acknowledged that Doc. 39 was "filed in error." However, the draft contained three critical deficiencies: (a) it sought to modify the Confirmation Order (Doc. 49) without first correcting the underlying Ballot Summary (Doc. 39); (b) it referenced "4 ballots we received" when the client file production contains five signed acceptances; and (c) it did not attach the signed ballot acceptances or an amended ballot summary as exhibits.

18. The Debtor responded on March 24, 2026, identifying these deficiencies and requesting corrections. Counsel did not respond.

19. The March 26 deadline passed. Counsel filed nothing.

20. On March 30, 2026, eleven days after the Debtor's directive and four days after the deadline, Counsel withdrew his first attempt at an amended ballot summary (Doc. 92, withdrawing Doc. 91), filed a corrected Ballot Summary reporting five creditor acceptances (Doc. 93), and filed a Motion to Amend the Confirmation Order from Section 1191(b) to Section 1191(a) (Doc. 94). This Court granted expedited hearing on the same date (Doc. 96).

21. The Debtor acknowledges Counsel's corrective filings. The timeline is nonetheless relevant to this Court's assessment of the withdrawal motion: it took 677 days from the filing of Doc. 39 for Counsel to file a corrected ballot summary, and it required the Debtor's own investigation, client file review, and formal written directive, with two rounds of corrections, to produce an accurate filing. Counsel has had the signed ballot acceptances in his possession since at least May 22, 2024.

22. Counsel's own post-confirmation conduct suggests awareness that the plan should have been confirmed under Section 1191(a). On June 20, 2024, six days after confirmation, Counsel emailed the Debtor with payment instructions stating: "The plan has 24 months of payments and we'll see where we are after that 24 month period." (Exhibit HH.) Under Section 1191(b), the plan term is 36 to 60 months. A 24-month payment horizon is consistent with Section 1191(a) consensual confirmation, not the Section 1191(b) cramdown that Counsel's own ballot summary produced. In the same email, Counsel instructed the Debtor to set up a $500 per month automated ACH debit to WM Law, stating: "Please complete the attached

ACH form and we can just auto draw that." (Exhibit HH.) Counsel thus administered the case as though it were a 1191(a) confirmation while having filed the ballot summary that forced 1191(b).

23.   The inaccurate reporting of the Section 1191(a)/1191(b) designation is not isolated to this case. PACER records from two other WM Law Subchapter V cases reveal the same pattern of ballot summary errors and 1191(a)/1191(b) confusion:

 a. **My Sister's Closet LLC, Case No. 23-20604 (D. Kan., Chief Judge Somers).** Counsel filed a ballot summary (Doc. 72) reporting one ballot in favor and none opposing, yet the plan was confirmed as non-consensual. The Court discovered the error seven months later and entered an Amended Confirmation Order (Doc. 91, October 16, 2024) correcting the designation. Counsel subsequently filed a Motion for Entry of Chapter 11 Discharge Pursuant to a Consensual Plan Confirmed Under 11 U.S.C. Section 1191(a) (Doc. 94), demonstrating familiarity with the 1191(a) framework.

 b. **David Brian Miller, Case No. 23-20725 (D. Kan., Judge Somers).** Counsel filed a ballot summary (Doc. 97) that was immediately withdrawn (Doc. 99) and refiled. The plan required four versions, three UST objections, and 17 months to confirm. Counsel subsequently filed a Motion for Entry of Chapter 11 Discharge Pursuant to a Consensual Plan Confirmed Under 11 U.S.C. Section 1191(a) (Doc. 180), which the Court found defective, issuing an Order to Correct (Doc. 181).

Additionally, Counsel produced Mr. Miller's confidential bankruptcy documents, including his name, case number, creditor, and debt amount, in the Debtor's client file production on March 5, 2026, in violation of Counsel's duty of confidentiality under Mo. R. Prof. Conduct 4-1.6. (Exhibit II.) The Debtor notified both Counsel and Mr. Miller of the breach. Counsel confirmed removal of the documents on March 10, 2026.

In three consecutive Subchapter V cases, My Sister's Closet (confirmed March 2024), VCS (confirmed June 2024), and Miller (confirmed November 2024), the same attorney produced defective ballot summaries, required corrections by either the Court or the client, and ultimately sought relief under Section 1191(a). This is not an isolated clerical error. It is a recurring failure in a core function of Subchapter V plan confirmation.

**C. Withheld Creditor Communications**

24.   The client file production revealed two categories of communications that Counsel received but never forwarded to the Debtor:

 a. **CIT/Hayden thread (February 3-6, 2026).** Counsel exchanged seven messages with opposing counsel Austin Hayden regarding the CIT vehicle liens. In this thread, Counsel admitted to opposing counsel: "I have no idea about the interplay between this and the claims filed by CIT." Hayden offered a settlement

path and indicated willingness to obtain CIT's signature on title transfer forms. Counsel never relayed any of this to the Debtor. Three days later, on February 9, 2026, Counsel told the Debtor: "CIT is not going to waive the liens, and I don't think the court will require them to."

b. **AmEx/Kleppinger default notices (December 18, 2025 and January 22, 2026).** Counsel received two letters from Becket & Lee regarding an alleged plan default on American Express claims. Counsel forwarded the first letter (dated December 18, 2025) to the Debtor on December 23, 2025, but never forwarded the second letter (dated January 22, 2026). The January 22 letter was copied to the Subchapter V Trustee (Rob Messerli). The Debtor did not learn of the second letter until the March 17, 2026 client file production, nearly two months after it was sent and six days after Counsel filed the withdrawal motion (Doc. 78). Counsel took no action in response to either letter. American Express is a Class 3 unsecured creditor. Disposable income under the plan is $0. No payment was due.

## D. Ally Financial Stay Violations

25. Ally Financial has made four attempts to repossess the Debtor's 2015 Isuzu NPR in violation of the automatic stay (11 U.S.C. Section 362(a)). Ally voluntarily withdrew its Motion for Relief from Stay (Doc. 54) on June 19, 2024, five days after plan confirmation. No order lifting the stay has been entered as to this vehicle.

25A. Before the withdrawal, Counsel drafted and filed a stipulation with Ally (Doc. 46) without consulting the Debtor regarding its terms. The stipulation states that "Debtor admits the allegations contained within the Motion for Relief from Automatic Stay" and that "the failure to address the scheduled obligation of Ally Bank in the plan was inadvertent on the part of the debtor and its counsel." (Exhibit K.) The stipulation attributed the plan omission in part to the Debtor. In fact, the Debtor informed Counsel of the Ally obligation before the petition was filed. On January 3, 2024, the Debtor emailed Counsel: "Ally...should be included in the form. Amount owed is 10300." Counsel used this information to list Ally on Schedule D (Doc. 1, p. 20) but omitted Ally from the plan and never prepared an Ally ballot. The omission was entirely Counsel's. No billing entry reflects any communication with the Debtor about the admissions contained in Doc. 46.

26. Counsel was notified of the first stay violation on May 12, 2025 when opposing counsel wrote: "My client wants to proceed with repossession." (Exhibit JJ.) Counsel acknowledged default on May 14, 2025 but filed no protective motion. No motion for contempt, no supplemental stay notice, and no demand for sanctions has been filed in 14 months.

26A.   Counsel's inaction in this case is inconsistent with his conduct in other matters involving the same opposing counsel. In Bassett, Case No. 25-20315-can11, also before this Court, Counsel actively responded to a Motion for Relief from Stay filed by the same opposing counsel, Evan Moscov, on behalf of Ally Financial during the same period. (Exhibit RR.) Counsel and Mr. Moscov have a long-standing professional history: PACER records reflect that they have appeared on opposite sides of bankruptcy filings since at least 2009 in the Northern District of Illinois, with Mr. Moscov filing claim transfer notices in eleven of Mr. Blay's thirteen Chapter 13 cases during that period. (Exhibit QQ.) The Debtor raises this history not to allege any improper arrangement, but because it provides context for why Counsel defended against Ally's counsel in Bassett while taking no protective action in this case over the same fourteen-month period despite four documented stay violations.

27.   The Debtor has incurred vehicle rental costs of $7,051.71 through March 2026 (and continuing) due to the inability to use the Isuzu NPR during the period of unresolved stay violations.

28.   Counsel acknowledged these damages in writing. On December 22, 2025, Mr. Blay stated in an email to the Debtor, copied to Mr. Wagoner and WM Law's office manager: "That doesn't eliminate your damages from the registration issues, but I wanted to confirm that we took your issue seriously and are looking to the court to help fix it." (Exhibit KK.) Counsel thus conceded that the Debtor had sustained damages, that those damages remained unresolved, and that the court, not counsel's own prior inaction, would need to address them.

### E. Counsel Credibility: Contradictory Positions

29.   In the same December 22, 2025 email, Counsel described his collaboration with the Debtor on draft pleadings as follows: "we have a duty as lawyers to verify not only the facts and discuss issues like tone with you (which we did, getting your input on edits) but also to verify the correct citations." (Exhibit KK.) Counsel characterized the Debtor's involvement as a normal part of the attorney-client drafting process.

30.   Forty-eight days later, on February 9, 2026, Counsel described the identical practice as grounds for refusing to act: "we're not here to file your ghostwritten pleadings. If you are doing AI legal research and drafteing [sic], you're serving as your own attorney." (Exhibit LL.)

31.   The only material difference between these two dates was counsel's trajectory. In December 2025, Counsel was still billing the estate and actively representing the Debtor. By February 2026, Counsel was preparing to withdraw. The Debtor's drafting involvement did not change. Counsel's characterization of it did.

32.   On January 6, 2026, following the Court's order identifying procedural deficiencies in the Debtor's Motion for Determination of Secured Status (Doc. 70), Counsel emailed

the Debtor: "the court is telegraphing an unwillingness to even grant the relief we are requesting (or if they do grant it, take their sweet time in doing so)." (Exhibit MM.) The Debtor corrected Counsel thirty-five minutes later, noting that the Court had identified fixable procedural deficiencies and set the matter for hearing, the opposite of unwillingness. Counsel's characterization of this Court's actions was inaccurate and, if left uncorrected, would have discouraged the Debtor from pursuing relief that the Court was actively facilitating.

32A. Similarly, on November 25, 2025, Counsel told the Debtor "I did email the lawyer" regarding Ally's counsel. The client file production reveals that Counsel's "email" was a blank forward of a year-old June 2024 confirmation order chain · three stacked signature blocks, no content. (Exhibit Z10.) Counsel represented that he had taken action when no substantive communication occurred.

32B. On January 29, 2026, four days before the Debtor filed his initial objection to the withdrawal motion (Doc. 82), WM Law's managing partner stated in writing: "There has been no wrongdoing or malfeasance by WM Law. Refunding any fees is inappropriate and out of the question." (Exhibit SS.) On the basis of this representation, the Debtor's initial objection stated: "The Debtor does not allege malfeasance or ethical misconduct by current counsel in this objection." (Doc. 82, para. 3.) The Debtor did not yet have the ballot evidence, the withheld communications, or the fee documentation now before this Court.

32C. Two months later, on March 30, 2026, Mr. Blay filed a Motion to Amend the Confirmation Order (Doc. 94) stating: "Document 39 was filed in error by counsel." Mr. Blay's own filing contradicts Mr. Wagoner's blanket denial. Filing a false ballot summary that suppressed five creditor acceptances and forced the wrong confirmation path is not "no wrongdoing." It is the specific wrongdoing that deprived this estate of immediate discharge for twenty-one months and counting. The Debtor's initial objection was filed before these facts were known. This supplemental filing is made in light of what the record now shows.

**F. Post-Confirmation Inaction**

33. Counsel's billing records reflect an 11-month period (October 2024 through August 2025) with zero logged billable work, during which WM Law collected ten automated ACH debits of $500 each from the DIP operating account, totaling $5,000 in estate funds for no corresponding services.

34. These collections are inconsistent with the confirmed plan's own terms. Section 2.5 of the Plan (Doc. 29, p. 10) provides that "the Debtor shall be the disbursing agent for all payments made under this Plan" and that "distributions to Creditors provided for in this Plan will be made by the Debtor, directly." An automated ACH debit initiated and controlled by Counsel is not a distribution made by the Debtor. Counsel bypassed

the plan's disbursement structure to collect fees directly from the estate without the Debtor's active authorization for each payment.

35.   During this same period, Counsel failed to: address the Ally stay violations, correct the CIT unsupported debt, file a supplemental fee application, timely file the Year 1 annual report (due July 2025, sent to the UST and Trustee on March 19, 2026 only after the Debtor's directive, and not yet docketed), or communicate with the Debtor regarding any case development.

## G. Rate Discrepancies

36.   WM Law charged the Debtor $350 per hour for attorney time and $175 per hour for paralegal time. Cross-case PACER evidence from eight contemporaneous WM Law filings in six cases establishes that $300 per hour for attorneys and $125 per hour for paralegals was the firm's standard rate throughout 2024. The Debtor was the only WM Law client charged $350/$175 among the eight fee applications reviewed.

37.   The Tomlinson Application to Employ (Exhibit P; Doc. 8, Case No. 24-20236, D. Kan., filed March 11, 2024) is the most direct comparison. Filed by the same attorney (Blay), using the same template, notarized by the same paralegal (Douglas Sisson), just 60 days after the Debtor's Doc. 13, it discloses attorney rates of $300 per hour and paralegal rates of $125 per hour. The only material difference between the two applications is the rate charged to the client: the Debtor paid $50 more per hour for attorney time and $50 more per hour for paralegal time than a client represented by the same firm, the same attorney, in the same time period.

38.   At the rates WM Law charged in every other fee application reviewed on PACER ($300/$125), the same 44.4 hours billed in the Fee Application (Doc. 55) would have produced $12,340.00 in fees, $2,220.00 less than the $14,560.00 submitted to this Court. The Fee Approval Order (Doc. 57) approved $14,442.90. Had the Fee Application used the rates reflected in the firm's other PACER filings, the total would have been $12,530.90. No explanation for the selective pricing has been provided.

## H. Firm Supervision and Accountability

39.   This Court's Order Approving Employment (Doc. 18, entered February 5, 2024) authorized the employment of "WM Law Firm and its following attorneys, Ryan A. Blay, Jeffrey L. Wagoner, Ryan M. Graham, Errin P. Stowell, Chelsea Williamson." Jeffrey L. Wagoner is therefore a court-authorized attorney for the Debtor in this case.

40.   Despite this, Mr. Wagoner has disclaimed any obligation to the Debtor, stating: "Ryan is your lawyer, not me" and characterizing his inclusion on Doc. 18 as "standard practice to list the other attorneys... does not mean I am obligated to take over your case." (Email, March 6, 2026.)

41.   Mr. Wagoner's conduct contradicts this disclaimer. He exercised sole authority over client fund refunds (Ryan: "ONLY he has authority to issue checks," December 28, 2023). He was copied on substantive case correspondence throughout the representation. He personally edited every ballot cover letter sent to creditors, as confirmed by Word document metadata. (Exhibit NN.) He made representations to the Debtor about the case on January 28, 2026, and issued a detailed written position on fees, lien strategy, and the Debtor's claims on March 6, 2026. Additionally, PACER records from Petersen, Case No. 21-21294 (D. Kan.), reflect that Mr. Wagoner personally filed three claim objections against entities represented by the same opposing counsel who represents Ally Financial in this case, then withdrew all three objections the day before the scheduled hearing after opposing counsel responded. PACER records further reflect that Mr. Wagoner's cases involved entities represented by this same opposing counsel as recently as May 2024 (Case No. 21-50234, D. Kan.) · during the same period WM Law was representing the Debtor in this case.

42.   Mr. Wagoner has not responded to the Debtor's ballot correction directive of March 19, 2026, on which he was copied. He has not responded to any of the Debtor's communications regarding the deficiencies identified in this filing. As managing partner of WM Law, Mr. Wagoner bears supervisory responsibility under Mo. R. Prof. Conduct 4-5.1 for the work performed, and not performed, by attorneys under his direction in this case.

43.   The Debtor raises Mr. Wagoner's role because the withdrawal motion (Docs. 78, 80) was filed and signed solely by Ryan A. Blay. Doc. 78 defines "attorney Ryan A. Blay of WM Law firm (collectively hereinafter 'WM Law')" and seeks withdrawal of "WM Law" and "the undersigned" from further representation. However, no separate motion has been filed on behalf of the remaining court-authorized attorneys (Jeffrey L. Wagoner, Ryan M. Graham, Errin P. Stowell, and Chelsea Williamson), each of whom was individually authorized by this Court's employment order (Doc. 18).

44.   If this Court grants Mr. Blay's personal withdrawal, the remaining WM Law attorneys remain subject to Doc. 18 and continue as counsel of record for the Debtor unless separately released by the Court. The Debtor intends to hold the firm and its remaining authorized attorneys to their obligations under that order, including the remedial actions identified in Section III(e) below, until this case is administratively closed. WM Law and its attorneys should be aware of this consequence before the April 15 hearing.

---

## III. RELEVANCE TO MOTION TO WITHDRAW

45.    The Debtor does not ask this Court to resolve the fee question in this filing. The Debtor brings these facts to the Court's attention because they bear directly on the pending withdrawal motion:

a.    **The case's current posture results from Counsel's errors.** The secured debt unsupported by proofs of claim, the ballot inaccurate reporting, and the unaddressed stay violations are not pre-existing conditions Counsel inherited. They are conditions Counsel created or failed to address during 26 months of representation.

b.    **Counsel's own corrective filings confirm the scope of the problem.** On March 30, 2026, Counsel filed a corrected Ballot Summary (Doc. 93) and a Motion to Amend the Confirmation Order (Doc. 94), acknowledging that the original ballot report (Doc. 39) was "filed in error." This correction came only after the Debtor's independent investigation, client file review, and formal written directive, and only after two rounds of deficiency corrections by the Debtor. Counsel's filing confirms that the Debtor was confirmed under Section 1191(b) instead of Section 1191(a) as a direct result of Counsel's error. The ballot correction motion remains pending before this Court. Counsel should not be permitted to withdraw while the consequences of this error remain unresolved.

c.    **Withdrawal without accounting leaves the estate unprotected.** If Counsel withdraws, the Debtor, a corporation that generally must appear through licensed counsel, will have no mechanism to prosecute the pending ballot correction motion (Doc. 94), correct the plan errors Counsel introduced, enforce the stay Counsel failed to protect, or recover fees collected without court approval.

d.    **The complexity Counsel created makes substitution impracticable.** Since Counsel filed the withdrawal motion, the Debtor has contacted the following firms seeking replacement bankruptcy counsel:

| Firm | Attorney | Date | Result |
| --- | --- | --- | --- |
| Evans & Mullinix | Colin Gotham | 2/8/26 | Initial interest, no engagement |
| Sader Law | Brad McCormack | 2/8/26 | Declined: "We will not be able to help you in this situation." |
| Krigel Nugent + Moore | Erlene Krigel | 2/8/26 | Initially engaged; withdrew 3/20/26 |
| Shamberg Johnson & Bergman | Jonathan Margolies | 2/8/26 | Declined: "unable to commit" |
| Cook Ellis LLC | Coleman Ellis | 2/9/26 | Responded; no engagement |
| Edgar Law Firm | Catina Rehrig | 2/9/26 | Declined |
| Phillips & Thomas | George Thomas | 3/8/26 | Declined: "Not something our firm is interested in." |
| Spencer Fane | Eric Johnson | 3/8/26 | Declined: "Not taking on debtor side engagements." |
| Thompson Coburn | Joseph Orbach | 3/8/26 | Conflict: represents CIT |
| Conroy Baran | Robert Baran | 3/8/26 | No response |

Four additional firms (Merrick Baker & Strauss, Grimes & Rebein, Polsinelli, Spencer Fane) were identified but could not be reached by email or declined firm-wide. None of the fourteen firms contacted has agreed to take the case. This Court observed at the February 11, 2026 hearing that "no lawyer is going to jump into a case like this at this stage." The reason no lawyer will take it is the condition Counsel left it in: a plan built on $93,092 in unsupported debt, unreported ballot acceptances, unaddressed stay violations, and an unfiled Year 1 annual report. Counsel should not be permitted to create conditions so complex that no successor will accept the engagement, then cite that same complexity as grounds for withdrawal.

e. **Withdrawal delays closing of this case.** The Debtor's goal is to complete the confirmed plan, obtain discharge, and close this case. The path to closing requires: (1) amendment of the confirmation order from Section 1191(b) to Section 1191(a) and entry of discharge (now pending as Doc. 94); (2) modification of the plan under Section 1193(c) to remove $93,092 in obligations to creditors that filed no proofs of claim; (3) docketing of the Year 1 annual report (due July 2025, sent to the UST and Trustee 7.5 months late on March 19, 2026 only after the Debtor's directive, but not yet filed on the docket); and (4) resolution of the Ally Financial stay violations. Every one of these items is either an error Counsel created or an obligation Counsel failed to perform. The Debtor is not the source of delay. Permitting withdrawal without requiring completion of these items transfers the burden of Counsel's errors to the Debtor and the Court, and extends the timeline to closing.

f. **The Court and the United States Trustee may wish to examine these facts** in connection with the withdrawal motion, under 11 U.S.C. Section 329(b), Fed. R. Bankr. P. 2017, or such other authority as the Court deems appropriate.

---

## IV. SUMMARY OF FEES PAID VERSUS SERVICES DELIVERED

46.    The following table summarizes what $19,738.00 in attorney fees produced:

| Obligation | What Was Delivered | Result to Estate |
|---|---|---|
| Complete petition with schedules | Bare petition; schedules missing at filing | Court deficiency notice (Docs. 4, 5) |
| Accurate lien analysis | $93,092 in unsupported or misclassified secured debt; Class 2 payment overstated by $62,254.80 | Plan obligations materially distorted |
| Accurate ballot summary | 5 acceptances reported as "No Vote" (Doc. 39); corrected 677 days later only after Debtor's investigation and directive (Doc. 93) | Forced Section 1191(b) cramdown; no discharge; correction now pending (Doc. 94) |
| Creditor protection | 4 stay violations; zero motions filed in 14 months | $7,051.71 in avoidable vehicle rental damages (through March 2026; continuing) |
| Post-confirmation administration | 11 months zero work; Year 1 annual report sent 7.5 months late (not yet docketed) | $5,000 ACH collected during inaction |

| Court-approved fee compliance | $3,643.40 retained above Doc. 57 approval (net of $1,651.70 refund); $2,220 selective rate premium | No supplemental application filed; refund occurred only after Debtor identified logging failures |
|---|---|---|
| Accurate case status advice | "Substantially consummated" (Feb. 20, 2026) | One payment each to two creditors; $0 unsecured distributed |

## V. COUNSEL'S PROFESSIONAL BACKGROUND AND ADVERTISED COMPETENCIES

47.  The failures identified in this filing, the unsupported lien obligations, the unaddressed stay violations, the unreported ballot acceptances, are not attributable to inexperience in these practice areas. Counsel's own professional history establishes that the specific services the Debtor paid for were services Counsel held himself out as qualified to perform.

48.  Counsel's biography on the website of his former employer, LakeLaw (lakelaw.com), archived by the Wayback Machine between October 2009 and November 2011, lists Counsel's practice areas as including "automatic stay violations, lien avoidance, adversary proceedings." (Exhibit OO, Wayback Machine capture, November 22, 2010.) This biography was publicly available throughout Counsel's employment at LakeLaw and accurately described the work Counsel was performing during that period.

49.  The same biography identifies Counsel's prior employment at two firms that were subsequently sanctioned for systemic failures in consumer bankruptcy representation:

   a.  **Robert J. Semrad & Associates (Chicago, IL, 2008-2009),** also operating as DebtStoppers. In June 2010, the U.S. Bankruptcy Court for the Northern District of Georgia issued a 17-page sanctions opinion finding that the Semrad firm had engaged in widespread filing of petitions without client authorization, alteration of documents after client signature in 19 of 22 reviewed cases, modification of petition signature dates "in almost every case," and operation of a quota-based bonus system that incentivized volume over quality. *In re Harmon*, No. 09-84515-MGD (Bankr. N.D. Ga. June 3, 2010). (Exhibit PP.) Robert J. Semrad was subsequently suspended by the Illinois ARDC in 2023.

   b.  **Macey & Aleman (Chicago, IL, 2008),** the operating entity for Legal Helpers, PC, a firm that employed 300-400 attorneys nationwide. In July 2012, the Illinois Attorney General obtained a $2.1 million restitution settlement against Legal Helpers after an investigation found that 32 of 36 sampled client files contained no entries of attorney work or client communications. In 2013, the U.S. Bankruptcy Court for the Southern District of Texas (Bohm, J.) issued a 92-page opinion in *In re Bradley*, 495 B.R. 747 (Bankr. S.D. Tex. 2013), defining the characteristics of a "bankruptcy mill" based substantially on Legal Helpers' business model. Thomas G. Macey and Jeffrey J. Aleman were each

suspended for two years by the Illinois ARDC in 2015.

50. References to these prior employers do not appear on Counsel's current professional profiles. His biography on WM Law's website, his KC Estate Planner profile, and his NACTT Academy listing identify no prior firm employment. The archived LakeLaw biography is the only publicly available source preserving the complete employment history.

51. This professional background bears directly on the reasonableness of the fees charged under 11 U.S.C. Section 330. The Debtor paid $19,738.00 for representation by an attorney whose own published biography advertised competency in lien avoidance, stay protection, and adversary proceedings. The estate received none of these services:

    a. **Lien avoidance** (advertised). No vehicle proofs of claim were filed; $72,842 in secured debt unsupported by proofs of claim remains on the plan. Counsel told the Debtor on January 7, 2026: "whether I've dealt with lien determination and title issues in Sub V before. I have not." Counsel stated to this Court at the February 11, 2026 hearing: "we're a little stumped here." (Doc. 90, audio at 4:23.)

    b. **Automatic stay violations** (advertised). Four Ally Financial stay violations over 14 months; zero protective motions filed; $7,051.71 in avoidable damages.

    c. **Adversary proceedings** (advertised). Zero adversary proceedings filed in this case.

52. Counsel's claim of unfamiliarity with lien determination is further contradicted by his own docket record. PACER filings confirm that Counsel filed lien avoidance motions at Legal Helpers in 2008 (Tucknott, No. 08-14653, N.D. Ill.; Wilson, No. 08-04029, N.D. Ill.), lien avoidance adversary proceedings at LakeLaw from 2011-2015 (including Lochen v. PNC Bank, No. 13-02936, E.D. Wis., nature of suit code 21: "Validity, priority or extent of lien"), and at least 15 lien strip adversary proceedings at WM Law from 2019 to the present, including Post v. UMB Bank, No. 19-41414, W.D. Mo. (lien strip granted). Counsel has performed lien determination work continuously since 2008 across every firm at which he has been employed.

53. The Debtor does not raise Counsel's professional background to seek sanctions or to characterize Counsel's prior employers. The Debtor raises it because it is directly relevant to Section 330's requirement that fees be reasonable for the services rendered. An attorney who advertises and routinely performs lien avoidance, stay protection, and adversary proceedings cannot reasonably charge $19,738.00 for a representation in which none of those services were provided, and then claim unfamiliarity with those services as justification for withdrawal.

---

## VI. COUNSEL'S APRIL 6, 2026 EMAIL: REPEATED INCORRECT LEGAL ADVICE AND COERCION

54.    On April 7, 2026, within hours of the filing of this supplement, Counsel responded to the Debtor's March 31 email raising six unresolved issues. The response was sent to the Debtor with copies to Jeffrey Wagoner, Rosana <sup>Tovalin</sup>, and the Subchapter V Trustee. (Exhibit TT.) Because this email was received before the filing deadline and contains positions directly bearing on the withdrawal analysis, the Debtor includes it here.

55.    Counsel's response contains five positions that bear directly on this Court's evaluation:

  a.    **Repeated incorrect legal advice on Section 1193(c).** Counsel states: "Based on your year 1 annual report and payments to us of our administrative claims per the plan, you have substantially consummated your plan and you are unable to modify the plan." This is the same position Counsel took on February 20, 2026 (paragraph 34 above). It remains wrong. Section 1181(a) makes Section 1127 inapplicable to Subchapter V cases. The substantial consummation bar on plan modification that applies in traditional Chapter 11 does not apply here. Section 1193(c) governs. And even under Section 1193(c), the plan is not substantially consummated under Section 1101(2): one month of payments out of sixty, zero dollars to unsecured creditors,                                        Counsel's own framing is revealing · the only plan "distributions" he can identify are "payments to us of our administrative claims." The sole beneficiary of Counsel's consummation argument is Counsel's own firm.

  b.    **Explicit coercion.** Counsel states: "if you put me in the position of having to argue with the principal of my client, you are only giving me more support for my chief argument on our motion to withdraw · an inherent and unavoidable conflict." This statement conditions ongoing representation on the Debtor's acceptance of Counsel's legal position. A client who identifies a demonstrably incorrect legal analysis is not creating a conflict. A lawyer who threatens to convert the client's disagreement into ammunition for withdrawal is.

  c.    **Continued refusal to produce the client file.** Counsel states he will produce drafts only "upon entry of a protective order." He accuses the Debtor of (1) approaching WM Law clients and (2) uploading documents to "generative AI products." No protective order has been sought. No motion for one has been filed. The Debtor's March 24 email to the five attorneys named on Doc. 18 · all of whom are court-authorized counsel in the Debtor's own case under this Court's employment order · is not contact with another client. Under <sup>Mo. R. Prof. Conduct 4-1.16(d)</sup> Mo. R. Prof. Conduct 4-1.16(d), counsel shall surrender the client file upon request. Conditioning that obligation on unsubstantiated accusations, raised for

the first time nine days before a withdrawal hearing and in the presence of the Subchapter V Trustee, is pretextual.

d. **Annual report: "submission" versus "filing."** Counsel now states: "I already addressed this before when I submitted the report to Rob Messerli and Adam Miller at the US Trustee's office . . . The plan calls for submission of the report, and I have complied." On March 30, 2026, Counsel told creditor's counsel that his office "filed on behalf of the debtor" these same reports. (Exhibit NN.) Counsel cannot characterize the same act as "filed" to a creditor and merely "submitted" when questioned by his own client. The docket reflects neither. The reports are not on CM/ECF.

e. **Ally stay violations conceded.** Counsel does not dispute that zero motions have been filed in fourteen months. Instead, Counsel asks the Debtor to "give careful thought" to whether stay violations are worth pursuing if a discharge is imminent. This conflates two independent issues. A discharge does not retroactively cure stay violations. Damages under Section 105(a) arise from the violation itself, regardless of discharge status. But the admission is notable: fourteen months of inaction, conceded in writing.

56. Counsel suggests the Debtor "retain new counsel and file a new Chapter 11 plan for Victory" rather than modify the existing plan under Section 1193(c). Filing a new bankruptcy case imposes costs, delay, and a second filing on the Debtor's record. It is the recommendation Counsel made on February 20, 2026 · to file a new case to correct errors in Counsel's own plan · and it remains unnecessary because Section 1193(c) is available.

57. Counsel's April 6 email was sent nine days before the April 15 hearing. It puts on the record, before the parties who will attend that hearing, (a) a legal position that is demonstrably wrong, (b) an explicit threat to weaponize the client's disagreement, (c) new pretextual justifications for withholding the client file, and (d) a factual contradiction about whether annual reports were filed or submitted.

---

## VII. PRAYER

WHEREFORE, the Debtor respectfully requests that the Court:

**A.** Deny Counsel's Motion to Withdraw (Docs. 78, 80); or in the alternative, if the Court grants Mr. Blay's personal withdrawal, order that WM Law and its remaining court-authorized attorneys (Doc. 18), specifically Jeffrey L. Wagoner, Ryan M. Graham, Errin P. Stowell, and Chelsea Williamson, continue as counsel of record until the following remedial actions are completed at no additional cost to the estate:

(i) Prosecute to completion the pending Motion to Amend the Confirmation Order (Doc. 94) from Section 1191(b) to Section 1191(a), including obtaining entry of discharge, and respond to any objections thereto;

(ii) File a motion under 11 U.S.C. Section 1193(c) to modify the confirmed plan to remove or correct the $93,092 in unsupported or misclassified secured obligations, including the $72,842 in CIT vehicle debt for which CIT has disclaimed liens and the $20,250 Channel Partners obligation for which no proof of claim was filed;

(iii) File a motion for contempt or other appropriate relief against Ally Financial for four violations of the automatic stay under 11 U.S.C. Section 362(a), occurring after Ally's voluntary withdrawal of its Motion for Relief from Stay (Doc. 54), and seek recovery of the Debtor's damages including vehicle rental costs of $7,051.71 through March 2026;

(iv) Docket the Debtor's Year 1 annual report (due July 2025, sent to the UST and Trustee on March 19, 2026 but not yet filed on the docket) and ensure timely filing of the Year 2 annual report due July 2026;

(v) Return to the estate all compensation collected in excess of the $14,442.90 approved by this Court (Doc. 57), or file a supplemental fee application under 11 U.S.C. Section 330 for the Court's review, including an explanation for the selective rate premium charged to this Debtor;

**B.** The Debtor states for the record that its objective is the closing of this case with entry of discharge. The Debtor is prepared to file all required reports and is not the source of any delay. Every outstanding deficiency identified in this filing was created by Counsel or results from Counsel's inaction. The Debtor will not permit the withdrawal of counsel, the substitution process, or any continuance to delay the completion of this case. If Counsel is released and the remaining firm attorneys decline to act, the Debtor will seek appropriate relief from this Court, including but not limited to sanctions and fee disgorgement under 11 U.S.C. Section 329(b);

**C.** Take such further action regarding attorney compensation as the Court deems appropriate under 11 U.S.C. Section 329(b), Fed. R. Bankr. P. 2017, or its inherent authority; and

**D.** Grant such other and further relief as is just and proper.

---

Dated: April 8, 2026

Respectfully submitted,

_____

Dan Brown, President
Victory Cleaning Systems, Inc.

_____

_____

Appearing pro se for limited purpose

---

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 8, 2026 , a true and correct copy of the foregoing document was filed with the Clerk of the United States Bankruptcy Court for the Western District of Missouri and served by email on the following parties:
on the following parties:

Ryan A. Blay
WM Law
blay@wagonergroup.com

Jeffrey L. Wagoner
WM Law
jeffwagoner@wagonergroup.com

Ryan M. Graham
WM Law
graham@wagonergroup.com

Errin P. Stowell
WM Law
stowell@wagonergroup.com

Chelsea Williamson
WM Law
williamson@wagonergroup.com

Rob Messerli, Sub V Trustee
rob.messerli@gunrockvp.com

Office of the United States Trustee


_____
Dan Brown